The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Good morning, all. The first case for argument today is 20-1577, National Products, Inc. v. High Gear Specialties. Mr. McMichael, whenever you're ready. Thank you, Your Honor, and good morning, Your Honors. May it please the Court? This is an appeal about a contract and an agreement shown by the words of that contract. The parties here are NPI and High Gear. They have been set to go to a full trial in Florida, but instead agreed to be bound by what NPI and a third party, ARCON, agreed to in a separate case, if that separate case were to settle. Mr. McMichael, just to shorten your time, I think we're familiar with the background of this. So now we're here, and can you tell me why the district court concluded that there was a latent ambiguity in the term royalty rate, and then he proceeded to credit testimony of a certain witness, namely Mr. Lee and perhaps others, as to how that worked out. What's the problem with that? Your Honor, I think the problem is the finding that that stipulation and the words of that stipulation between NPI and High Gear are ambiguous. And I think the reason for the district court's decision is that in the abstract, a royalty rate in a patent case can take different forms. It can be a percentage, and it could be a dollars per unit royalty, and the stipulation itself, that document, does not spell out exactly what NPI and ARCON, the separate parties, would ultimately agree to. But neither party, neither NPI nor High Gear, really argued that the stipulation is ambiguous. And I think that there's case law that we had presented in our brief, some examples saying that just because an agreement or a contract doesn't spell out exactly what some future event is going to be, doesn't make that agreement or contract ambiguous. And I think when you look at the circumstances here, you have a stipulation where NPI and High Gear are agreeing to be bound by something very specific. And that something very specific and very clear is whatever NPI and ARCON are ultimately going to agree to in the event of a settlement. Doesn't the settlement agreement indicate that it was going to be based on the number of units rather than a percent of sales? Your Honor, isn't the settlement... Isn't that what led the district court to arrive at 41 cents per unit? I do think that's part of what led the district court to the 41 cents per unit. But what's missing there is other language in the settlement agreement. And, in fact, it's in the exact same provision. This is paragraph 3E of the settlement agreement where the parties, NPI and ARCON, agreed that this royalty was going to be based not only on the number of units for the given time period, but also on the sales price of those products. And I think that's really the missing piece. This is Judge Stoll. One of the key distinctions between your argument and the district court's findings is the district court's findings that High Gear did not agree to be bound in the settlement agreement to all the language. That is, that it agreed to be bound by the lowest negotiated rate agreed to between ARCON and NPI, but not that it necessarily agreed to be bound by all the language in the settlement agreement. And, specifically, that it didn't agree to be bound by the language in paragraph 3E. That seems to be a challenge that you need to make, and you need to overcome that conclusion by the district court. What's your argument there? It seems to me that if I don't agree with you on that, then it's going to be difficult for you to succeed in your appeal. Yes, Your Honor. I think the answer to that is that the stipulation agrees to be bound by the lowest negotiated royalty rate agreed to by NPI and ARCON. And so the relevant question here is, what did NPI and ARCON agree to? And there are probably many ways in which the parties could have reached an agreement in this case, but here we have a fully integrated contract between NPI and ARCON. And the parties both agreed in their integration clause that this is the full scope of our agreement. This is what we're agreeing to. And so in terms of looking at the stipulation, the stipulation agrees to be bound by an agreement between NPI and ARCON. The full scope of the agreement between NPI and ARCON, in their own words, is set forth in the words of that settlement agreement. Can I interrupt you for a minute? I mean, I'm reading the agreement between NPI and Hygear, and it says that Hygear agrees to be bound by the lowest negotiated royalty rate. Now, you're taking that and you're saying Hygear agrees to be bound by the agreement between NPI and ARCON, and I think that that's different. Your Honor, I guess I don't see that as different. When I'm looking at the provision, I guess this is Appendix 85, if there's a settlement, so this is all in relation to a settlement that would happen between NPI and ARCON, but the language is lowest negotiated royalty rate agreed to by, and there's a typo, between NPI and ARCON for past damages and future royalties for the particular identical product. And so, kind of regardless of how you look at the lowest negotiated royalty rate language, it certainly needs to be the lowest. For example, if there are multiple rates, it needs to be a negotiated rate, and in fact, it's in settlement, so it was a negotiated royalty rate. But at the end of the day, it needs to be an agreed royalty rate between NPI and ARCON. And again, here we have a contract and the words of a contract that set forth that agreement. I have the same issue that I think Judge Stowe has. You keep going back to what you were bound by is the royalty rate, but then you keep going back to they're being bound by the agreement. And I think the point is that they're bound by nothing other than the royalty rate itself and not everything else in the agreement. Correct? I do think that's correct. Okay. Yeah, yeah, I do think that's correct. I mean, there are many provisions in the settlement agreement, and many of them are not relevant to the royalty rate, certainly. And I think those provisions, it's hard to do a reading of the stipulation where those provisions fall within the scope of what High Gear would be bound by and what NPI would be bound by in this situation. But at very least, the salient provisions of the agreement between NPI and ARCON about royalty rate are paragraphs 3D and 3E, which set forth what they're agreeing to, the amount of money, how that money is going to be calculated. And in particular here, that that amount of money is not just a flat royalty based on number of units. It's a royalty based on the sales price of the units that ARCON... Yeah, but sales price is itself ambiguous because that can lead to a percent of sales price or sales price per unit. And 3E tells you that it's sales price as reflected in the report produced in the ARCON action and further based on the number of units. So it's sales price per unit. Is that right? Yes, Your Honor, that's correct. And those two values, the average sales price referred to in an expert report and the number of units sold in that time period, those are both stipulated values. There's no dispute and there hasn't been any dispute about what those numbers actually are. So what do you want us to do? Well, in fact, I think it's important to note that the district court actually said that if you're giving... the district court essentially acknowledged that when you look at the settlement agreement and NPI's... the words of the agreement between NPI and ARCON, if you're to give meaning to those words and in particular this average sales price language, a percentage royalty rate is the only thing you can come to. There was testimony at the bench trial at this and in the order, the district court hinted at this. And I think the district court got a little bit off track when he said, but the settlement agreement is not the agreement that the district court is interpreting. And in fact, the one question here is what is the agreement on royalty rate between NPI and ARCON? Because that's what governs here. And on that point... What I understand went down was the district court, and you may disagree with his initial assumption, but there was some rate and ambiguity in the term royalty rate. And then the district court listened therefore to extrinsic evidence. He heard Mr. Lee that the parties contemplated a price per unit royalty, not a royalty rate. And he credited that testimony. And under a deferential standard, where's the clear error? Is it only in the fact that his initial assumption that he could reach the extrinsic evidence because there was no ambiguity? Is that your position? Your Honor, I guess it breaks down to a few points. We do think there's an error in the contractual interpretation aspect here, which is not the clear error standard. But in terms of the clear error standard and looking at what was agreed to between the parties, there's certainly also testimony in the record from NPI about the 20.5% rate and about the rates that had been proposed by both parties in the litigation. And at the end of the day, this 20.5% rate, it falls squarely between. It's a compromised position between what NPI had asked for and what the defendants had asked for in these litigations. But does the district court have to credit? I mean, can't he decide which side he wants to credit as to what was contemplated by the parties? And don't we owe that deference? Your Honor, on factual matters, I agree there is some deference given to the district court. But I think in terms of deciding whether that stipulation has an ambiguity, just because it adopts a value that is part of a separate document, it would be agreed to separately. And also the district court's handling of the words of the settlement agreement, and in particular its replacement of the words about the average sales price, those are not under the clear air standard. And I think that's where this problem started. Okay. Well, I think I heard your tone. Did we not hear the tone go off? I think that's correct. And unless the court has any further questions, I'll reserve the remainder of my time for rebuttal. Thank you very much. Thank you. Mr. Santelli. Good morning, Your Honors. May it please the court. I think the court has keyed in on the fundamental issue that we're really fighting about. In fact, it's the fundamental issue that led the parties to even head to the district court in the first place. The motion and the stipulation between the parties originally contemplated that once there was a set, settlement between Archon and NPI, the parties would work together to determine the lowest negotiated royalty rate that resulted from that settlement. Yeah, kind of an unfortunate situation. Quite reasonably, it seems to me, the parties wanted to avoid the cost of litigation and therefore entered at this settlement, and look where we ended up. It's kind of unfortunate, right? Yes, Your Honor, I agree. So, yes, I think it is unfortunate that we tried to resolve the matter in a fairly straightforward way, but ultimately the parties couldn't see eye to eye on this, and we brought the dispute to the district court for a short bench trial. I think that ultimately the hang-up from the beginning has been the idea that, although Highgear agreed that it would accept the lowest negotiated royalty rate that resulted from that settlement, there was no stipulation that it would agree to how NPI and or Archon chose to characterize the royalty rate. Ultimately, what we have, and there was testimony on this from both sides, was a settlement agreement that addressed a number of points. It had a release. It had a fully paid-up license that covered a number of products. It even included a release for all of NPI's 133, I believe, patents that it owned for every product that not only Archon but a related entity, Eyebolt, also was on sale at the time of settlement. So there were a number of other issues that were all resolved, and that all came into play. Now, in terms of the dispute that the court has before it, I know the first questions were related to the ambiguity issue, and I think that ambiguity really flows, at least in part, from the positions that NPI has taken, namely that Highgear should be bound by sections 3D and 3E, but we have to ignore the remainder of the settlement agreement. I believe counsel acknowledged that in response to the court's questions, and I think that that was troubling to Judge Dalton. Is a large part of the disparity here the inclusion of the numbers for Eyebolt in terms of pre-suit sales? No, Your Honor, the Eyebolt sales were not particularly large, but I do think that the pre-suit damages were one of the points that we focused on to highlight the fact that the way that Archon and NPI, the provisions 3D and 3E that they agreed upon, seemingly carve out damages that the stipulation required to be included in terms of the lowest negotiated royalty rate. So in terms of the actual numbers, there is a significant difference in terms of total numbers, but that's not the sole basis for the distinction. I think the larger problem in terms of where the numbers diverge from one another is the number that NPI and Archon point to to key their sales price on, and I believe the court asked a question or two about it. That was the average sales price that's referenced in Section 3E. Is that $3.38? Is that the number? Yes, Your Honor, and that number is the average sales price of the Craylor holder that was calculated by Mr. Miller, the Archon's expert in the case. However, Mr. Miller's entire report, at least the relevant portions are in the record, and the section that I'm looking at is Appendix 475. Mr. Miller explains that that average sales price for the Craylor holder was his evaluation of the sales price of what was the smallest saleable patent practicing unit, so ultimately he looked at a small subset of the total accused products of which the road vice, which is the analogous product that Archon sold, was a sliver. I think NPI even references the fact in its reply brief that the sales that he considered in the road vice were a mere sliver of the calculation he performed, and that $3.38, while it may have, according to Mr. Miller, reflected the smallest saleable patent practicing unit, in the context of that dispute, that number is far, far less than the average sales price of the road vice itself or of the tech gripper, and that's really where we get this disparity. Judge Dalton, during the bench trial, pressed NPI on this issue because of the fact that the distinction, the per-unit loyalty that NPI is promoting, would have Highgear pay six times the per-unit rate that Archon paid. Maybe if you can answer this for me, it will be a bit clarifying. If you had the benefit of hindsight, in other words, when you negotiated the stipulation, if you knew precisely what the settlement agreement was going to say, as it says now, how would you have worded the stipulation in terms of what you would be bound by? To be honest, I don't know that we would have done much different because I think, frankly, if you look at the entirety of the settlement agreement, that NPI and Archon settled the sale of $25 million worth of products for a million dollars that they settled based on the units, based on the total number of units they settled, that they were resolving, ultimately it came out to about 40 cents per unit. That is actually how the district court resolved it, is that the numbers were undisputed. We looked at all of the past sales of the units and also relied upon the projected sales of units into the future through the expiration of the patent by Archon. Those numbers were not in dispute. Ultimately, it was all of those units were licensed in a lump sum payment for a million dollars. From our perspective, we believe that all along what the district court arrived at, the 40 cents per unit is exactly what Hygear was anticipating, that it would simply pay the same rate that Archon paid. I suppose if I had to... Excuse me for a minute. This is Judge Stoll. I hear what you're saying, that you think that you wouldn't have changed much, but couldn't there have been some language perhaps you could have included to avoid all the litigation that had to ensue interpreting what had been agreed to? I think maybe that the parties contemplated there could be this kind of litigation by the paper that they submitted to the district court seeking a stay of the litigation at page 877 through 78 says, we think that we likely will be able to resolve damages, but there might be a trial and damages required. There's no... In any event, is there particular language that you would have included perhaps in hindsight that would have allowed you to avoid the litigation that you've had to engage in as a result of the uncertainty? Thank you, Your Honor. I guess since the entirety of this dispute has boiled down to do we look at a per unit rate or do we try to key in off of some sales price of certain units or total units, I guess if we were going to make changes, then we would have tried to make it more clear that the royalty rate would have been gauged in exactly the same way that the parties had treated them during the case and in expert reports, and that was on a per unit basis based upon the entirety of the sales. We recognized that Archon sold a number of accused products at a variety of different sales prices, and I think that's why they looked at it in total on a per unit basis. That's how the parties had always treated it during the litigation. Then looking back, if I knew what I did now and knew that the primary fight was going to be should we do the royalty rate on a per unit basis, that would be the change we'd make. But I do think given the evidence that the court received that that was really the only way that it could be analyzed, and I believe that Judge Dalton went through and analyzed it the way that he needed to. Now there are a couple of issues that NPI has raised. They've argued that he shouldn't have considered certain evidence and certain testimony. They've characterized most of the testimony as being parole evidence. I don't believe that's actually true because most of the evidence that was received related to the Archon NPI case, of course Judge Dalton was construing the stipulation with high gear. He construed it, and in terms of trying to analyze the rate that resulted from the settlement agreement, I believe that it was incumbent upon him to consider all the facts and all of the information that related to that settlement. That's what the testimony related to. So I don't believe, I think parole evidence, we could really only call it parole evidence if it was trying to change the meaning of the high gear stipulation, and that's not what Judge Dalton did. So I believe he was correct in considering the evidence he did, and ultimately reaching the conclusion he did. And it's the only way that the court could get to a number that resolved, as required by the stipulation, both past damages and future royalties, and that maintained a royalty rate that applied to both the road via the Archon product and the high gear product. If the court has more questions for me, I'm happy to take them, but otherwise I believe that based upon the briefing and based on the court's questions, NPI hasn't been able to establish clear error in the findings, nor in his interpretation of the stipulation, and that the court should affirm the findings of the district court. Thank you, Mr. Santori. Mr. McMichael, you have some time left on rebuttal. Thank you, Your Honor. I just want to respond to a few of the points that came up in High Gear's argument. I think the first and one really important issue we want to touch on is this, I guess, alleged price disparity or royalty disparity in what NPI is asking for in this litigation versus what it asked for in the Archon litigation. And this $3.38 number has gotten quite a bit of attention. I think it's undisputed that what that number is is a weighted average of the sales prices of three Archon products, and only one of those Archon products is the relevant one. And that one Archon product is the road vice product, and it has a sales price based on the record evidence at Appendix 466 of $15.61 per unit, which is almost identical to the sales price of High Gear's product of $16.40. And so we believe this is, again, part of what led the district court down the wrong road because the district court believed there was a 6X disparity in what NPI was asking for, when, in fact, the district court was comparing apples to oranges in these sales prices. There's really two steps here, or we view it as two steps. And the first is determining what is the royalty rate that NPI and Archon agreed to. And in our view, that's governed by their fully integrated contract. And if you give words to the average sales price language in 3E, that shows that NPI and Archon were agreeing to a royalty rate that depends on the average sales price, which this $0.41 per unit simply does not. And then once you've determined that percentage royalty rate, what needs to happen is it needs to be applied to High Gear's product. So there really is never a time when you compare the average sales price of all of Archon's products, which is the $3.38, to the average sales price of High Gear's product, which is about $16. The proper comparison here and the one that would have resolved some of those concerns about whether the settlement agreement can really be credited shows that there's no issue here. And I think I also want to clarify one issue. The council had pointed to Appendix 475 as the expert report, talking about the smallest saleable patent practicing unit. What's shown on page 475 is actually a different product. It's not the relevant product here of Archon. The parties very clearly in the stipulation agreed to the lowest negotiated royalty rate, agreed to between NPI and Archon for the particular identical product. And so that language renders 475 and these other lower prices of Archon's products irrelevant. And the only thing we're supposed to look at here based on the stipulation is the one identical product, the Archon Road Vise and the High Gear Tech Gripper, which have nearly identical prices. And I guess on the point about pre-suit sales also had come up with your honors questions. The way we look at that is that, I mean, this was a negotiation. Obviously, NPI and Archon knew there would be a negotiation and a potential settlement. That's what the stipulation says. And we've given – I'll wrap this up very quickly. Please proceed. We've given some evidence that issues like pre-suit sales were hotly disputed. There were a lot of issues about marking and whether NPI would be able to recover or Archon would need to pay for pre-suit sales. And the parties ultimately negotiated and agreed that a royalty would not be due for those pre-suit sales. And so that's why NPI is asking for exactly the same, number one, royalty rate, the same percentage royalty rated that received and agreed to with Archon, but also the same exact timeframe. NPI is not seeking pre-suit sales or, excuse me, a royalty on pre-suit sales from High Gear. So there's no disparity there either. Okay. Thank you. We thank both sides, and the case is submitted.